## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ANTHONY SEAN DUKE,

      Petitioner,                   CIVIL NO. 2:18-CV-13798

                                   HONORABLE PAUL D. BORMAN

v.                               UNITED STATES DISTRICT JUDGE

GEORGE STEPHENSON,

      Respondent,

_____/

## OPINION AND ORDER (1) DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND (2) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

Anthony Sean Duke, ("Petitioner"), confined at the Macomb Correctional

Facility in New Haven, Michigan, filed a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254, both *pro se* and through his attorneys Paul J.

Stablein and Robert Edward Higbee.  (ECF Nos. 1, 16.) Petitioner challenges his

convictions for first-degree felony murder, Mich. Comp. Laws § 750.316(b); first-

degree home invasion, Mich. Comp. Laws § 750.110a(2); larceny in a building,

Mich. Comp. Laws § 750.360; felon in possession of a firearm, Mich. Comp. Laws

§ 750.224f; and four counts of possession of a firearm in the commission of a

felony, Mich. Comp. Laws § 750.227b.  For the reasons that follow, the petition

for writ of habeas corpus is DENIED WITH PREJUDICE.

1

## I. BACKGROUND

Petitioner was convicted following a jury trial in the Livingston County

Circuit Court.  This Court recites verbatim the relevant facts relied upon by the

Michigan Court of Appeals, which are presumed correct on habeas review

pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th

Cir. 2009):

> Defendant's convictions resulted from the shooting death of Ron
> Hauser while Hauser was alone in his home. The body was discovered
> on December 31, 2011, after Hauser did not respond to attempts to
> contact him throughout the day. Hauser was known to carry a large
> amount of money on his person but it was not found after his home was
> searched. Defendant became a suspect after he posted on social media
> that he had $30,000 to spend, which was uncharacteristic of defendant.
>
> ***
>
> Numerous witnesses testified about defendant having a shortage of
> money shortly before the December 30, 2011, murder. Testimony from
> several people demonstrated that defendant had knowledge of Hauser
> and his habit of carrying a large amount of cash with him, and there was
> also testimony that Hauser hid more money on his property. According
> to Hauser's girlfriend, defendant had worked on Hauser's property as
> late as December 19, 2011, and she saw Hauser getting ready to pay
> defendant by pulling out his bag of cash. Defendant told the police that
> he had been to Hauser's home and knew he carried cash. Moreover,
> according to defendant's father, defendant had told him that he had
> knowledge of where Hauser kept his money and had stolen from him,
> without Hauser's knowledge, in the past. Moreover, Christopher
> Chambers recalled a 2006 conversation during which defendant, who
> was in need of money at the time, said that he wanted to rob Hauser and
> would kill him if necessary.
>
> Hauser was apparently shot around 9:30 p.m. on December 30, 2011;
> that is the time when his watch stopped. Hauser's brother testified that
> he had been speaking on the telephone with Hauser shortly before this

2

time as they simultaneously watched the same television channel. When Hauser's body was discovered the next day, the television remained tuned to this channel. Hauser's pattern was to watch the news on a different station after watching the show he had been watching while speaking with his brother.

Defendant initially told police that he was home at the time of the killing, which was contradicted by his girlfriend, and later defendant, who stated that he left home for around an hour to refill his truck with gasoline. Detective Mark Klein was unable to confirm a fuel purchase with any of the 680 receipts that defendant had provided or by receipts at the identified gas station. Moreover, Klein reported that defendant made a call from jail telling his girlfriend that he hoped that she knew that he was home on December 30, 2011.

It was determined that a gun was fired from outside of Hauser's home on a trajectory that travelled through a broken window, through the area where Ron's body was found, and to a bullet strike on the wall. Defendant was known to be an accurate shot. Moreover, the police found two sabot pieces in an area outside Hauser's patio door. Defendant was known to use saboted rounds. Klein found a receipt showing that defendant had purchased three boxes of Winchester 2.75 saboted one-ounce 12–gauge ammunition on November 14, 2011. The police recovered four sabot halves in defendant's yard, and recovered fired sabots at his father's residence.

Michigan State Police Firearms Examiner Jeffrey Amley concluded that the rifling characteristics on the sabots recovered from Hauser's home were fired from a Mossberg 12–gauge, rifled-barrel shotgun. Amley found that sabots recovered at defendant's home and his father's home were fired from the same rifle as the one that had fired the sabots at the crime scene. Defendant was known to have possessed a Mossberg 12–gauge shotgun with a rifled barrel and Bushnell scope. Michelle Brandenburg said defendant had borrowed her Mossberg 12–gauge, rifled-barrel, sighted shotgun during several hunting seasons, including in November 2011, and that although he returned it before Christmas 2011, she could not locate it when the police contacted her in March 2012. Moreover, defendant's stepbrother recalled that in early November 2011 defendant was shooting his 12–gauge Mossberg with a scope at their father's home and used Winchester 12–gauge rounds

3

with a sabot. Defendant's father also recalled seeing defendant shooting with a 12–gauge Mossberg with a scope in November 2011 in his backyard. In addition, defendant's girlfriend testified that defendant had hunted on their property with the Mossberg 12–gauge, and recalled that defendant had the Mossberg 12–gauge because he asked her to go hunting on December 16 and 29, 2011. She knew that defendant kept the gun in his truck, and said that she helped him return the gun to Brandenburg's kennel in January 2012. She also indicated that defendant had contacted her from jail to ask her to do something they had talked about previously—purchase a Mossberg 12–gauge to give to the police department. Finally, after his investigation, Klein concluded that defendant was the only individual who knew Hauser and his habits who had access to shoot at his own residence, Hauser's residence, and defendant's father's residence.

Defendant argues that there was no evidence that he entered Hauser's home and took money. However, there was testimony that Hauser had a pattern of carrying cash and also of placing the items from his pocket on his dryer before going to his basement for the remainder of the evening. The police observed items on the dryer but there was no cash on Hauser's body and no cash in the bag on the dryer. Additionally, a safe containing only an empty plastic bag was found near an attic access panel in the ceiling of the master bedroom with a stepladder beneath it; there was an impression in the ceiling insulation that was the size of the safe. Further, although money had been tight for defendant and his girlfriend in December 2011, Klein found a receipt indicating that defendant paid $140 for a hotel room on December 31, 2011, and in the early part of 2012, defendant gave $650 to a friend and purchased an expensive commercial lawnmower, a truck, and an air compressor. Moreover, there was testimony that defendant posted on his social media page that he had $30,000 to spend and that he had sent a friend a picture of several $100 bills fanned out on his bed around March 2012.

Defendant's father became concerned when he noticed that defendant was purchasing items, had no reaction to news of Hauser's death, refused a ride to Hauser's funeral, and confided that he had taken money previously from Hauser. Additionally, defendant's girlfriend found that defendant had searched how to beat a lie detector test on their

computer and the police found a printed report about the topic in defendant's truck.

*People v. Duke*, No. 330074, 2017 WL 603558, at * 1-3 (Mich. Ct. App. Feb. 14, 2017).

Petitioner's conviction was affirmed on appeal. *Id., lv. den.* 501 Mich. 862, 901 N.W.2d 99 (2017).

Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1), which was held in abeyance to permit petitioner to exhaust additional claims in the state court. (ECF No. 10).

Petitioner filed a post-conviction motion for relief from judgment with the state trial court, which was denied. *People v. Duke,* No. 14-22352-FC (Livingston Cnty. Cir. Ct., Aug. 7, 2020) (ECF No. 20-18).  The Michigan appellate courts denied petitioner leave to appeal. *People v. Duke*, No. 356074 (Mich. Ct. App. Apr. 15, 2021); *lv. den.* 967 N.W.2d 605 (Mich. 2022).

This Court reopened the case and permitted petitioner to file an amended habeas petition. (ECF Nos. 16, 17).

Petitioner in his original and amended petitions seeks relief on the following grounds:

> I. Petitioner's conviction must be vacated because the prosecutor presented constitutionally insufficient circumstantial evidence that petitioner was the person who committed the offense.

II. Petitioner was denied his right to a fair trial by the admission of evidence that he had downloaded a manual on the unreliability of and preparation for polygraph examinations.

III. Petitioner was denied a fair trial by the trial court's admission of highly prejudicial testimony that five years before the shooting petitioner allegedly stated that he wanted to rob the decedent and kill him if necessary.

IV. Petitioner was denied the effective assistance of appellate counsel.

V. Trial counsel deprived petitioner of his Sixth Amendment right to the effective assistance of counsel by failing to investigate potential lay and expert defense witnesses and by failing to properly cross-examine the State's witnesses.

VI. The prosecutor violated petitioner's Fourteenth Amendment right to due process (1) by committing discovery violations in derogation of *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose any documents regarding Mr. Chambers' April 2012 police interview, and (2) by introducing "suspect evidence" about sabots that were supposedly tampered with by the police prior to trial.

VII. The cumulative effect of the alleged errors deprived petitioner of his Fourteenth Amendment right to a fair trial.

## II. STANDARD OF REVIEW

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas

cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

## III. DISCUSSION

### A. Claim # 1.  The sufficiency of evidence claim

Petitioner first claims that there was insufficient evidence to establish his identity as the murderer, because no one actually witnessed him shoot the victim and there was no DNA or fingerprints to establish that he was the shooter.

It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. 358, 364 (1970).  But the crucial question on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).  A court need not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19 (internal citation and footnote omitted) (emphasis in the original).

When considering a challenge to the sufficiency of the evidence to convict, the reviewing court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (internal quotation omitted); *See also Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008) ("A conviction may be sustained based on nothing more than circumstantial

evidence."). Moreover, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (quoting *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508 n.17 (1957)); *See also Holland v. United States*, 348 U.S. 121, 140 (1954) (circumstantial evidence is "intrinsically no different from testimonial evidence," and "[i]f the jury is convinced beyond a reasonable doubt, we can require no more"); *Harrington v. Richter,* 562 U.S. 86, 113 (2011) ("sufficient conventional circumstantial evidence" supported the verdict).

A federal habeas court cannot overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith,* 565 U.S. 1, 2 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* Indeed, for a federal habeas court reviewing a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012). A state court's

9

determination that the evidence does not fall below that threshold is entitled to "considerable deference under [the] AEDPA." *Id.*

Under Michigan law, "[T]he identity of a defendant as the perpetrator of the crimes charged is an element of the offense and must be proved beyond a reasonable doubt." *Byrd v. Tessmer*, 82 F. App'x. 147, 150 (6th Cir. 2003) (citing *People v. Turrell*, 25 Mich. App. 646, 181 N.W.2d 655, 656 (1970)).  Identity of a defendant can be inferred through circumstantial evidence. *See Dell v. Straub,* 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002). Eyewitness identification is not necessary to sustain a conviction. *See United States v. Parks,* 278 F. App'x. 527, 536 (6th Cir. 2008)*; Dell v. Straub,* 194 F. Supp. 2d at 648.

In the present case, there was sufficient circumstantial evidence for the jury to conclude that petitioner shot the victim for several reasons.

First, several witnesses testified that petitioner knew that the victim had a large amount of money in his home.  There was also evidence that petitioner had financial problems. Circumstantial evidence that petitioner had worked for the victim and knew that the victim possessed a large amount of money and knew where the victim kept it hidden supports a logical inference that petitioner was the murderer. *See Stamper v. Muncie*, 944 F.2d 170, 174-75 (4th Cir. 1991).  Evidence that petitioner had money problems also supports a motive for petitioner to have robbed and killed the victim. *Id.* at 175.  This is particularly so in light of the fact

10

that petitioner began spending large sums of money after the murder and boasted on his Facebook page that he had $ 30,000.00 to spend.

Secondly, Christopher Chambers testified that petitioner told him in 2006 that he wanted to rob the victim and would kill him if necessary. Petitioner's prior threat to kill the victim was additional evidence to permit a rational trier of fact to conclude that petitioner was the person who murdered the victim. *See Pinchon v. Myers*, 615 F.3d 631, 643-44 (6th Cir. 2010).

Third, petitioner gave inconsistent alibis to the police, first telling them he was at home at the time of the shooting and later changing his story and telling them that he was at the gas station at the time of the shooting.  The police could not confirm either story.  There was also evidence that petitioner called his girlfriend from jail and told her he hoped she remembered where she was at the time of the shooting, ostensibly, to provide petitioner with an alibi.  The fact that petitioner told inconsistent stories to the police supports a finding that he was the murderer. See *Jeffries v. Morgan*, 446 F. App'x. 777, 784 (6th Cir. 2011).  An attempt to manufacture a false alibi defense can also be considered as evidence of guilt as to the crime charged under both Michigan and federal law. *See People v. Ranes,* 58 Mich. App. 268, 271-72 (1975); *See also Newman v. Metrish,* 492 F. Supp. 2d 721, 731 (E.D. Mich. 2007), *aff'd*, 543 F.3d 793 (6th Cir. 2008) (internal citation omitted).

Fourth, the evidence established that the rifling characteristics on the sabots recovered from the victim's home had been fired from a Mossberg 12–gauge, rifled-barrel shotgun.  Michigan State Police Firearms Examiner Jeffrey Amley determined that the sabots recovered at petitioner's home and his father's home had been fired from the same weapon as the sabots discovered at the victim's home. Evidence that the weapon used in the shooting was the same as the weapon that petitioner had been discharging at his house and his father's house is sufficient circumstantial evidence to establish his identity as the shooter. *See, e.g., Wiggins v. Parker*, 423 F. App'x. 534, 537 (6th Cir. 2011).

Fifth, petitioner's father noted that in the aftermath of the murder, petitioner was purchasing a number of items, had no reaction to the victim's death, and refused to attend his funeral.  There was also evidence that petitioner had done some research into how to take a polygraph examination and pass it even if that person was being deceptive.  A defendant's erratic and suspicious behavior in the aftermath of a murder is sufficient circumstantial evidence to support a jury's finding that the defendant was the perpetrator. *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000).  In particular, petitioner's failure to express any sorrow about the victim's death and his refusal to attend his funeral is evidence as to petitioner's consciousness of guilt. *See Simmons v. Winn*, 361 F. Supp. 3d 719, 733 (E.D. Mich. 2019).  Petitioner's research into using methods to defeat a polygraph

12

examination is also evidence of petitioner's consciousness of guilt. *See State v. Barton*, No. CA2005-03-036, 2007 WL 731409, at \*13 (Ohio App. 12th District, Mar. 12, 2007) (accused's use of counter measures in an attempt to defeat a polygraph examination may indicate consciousness of guilt).

Petitioner argues that there was insufficient evidence to convict him because the police did not recover DNA evidence, fingerprints, or other forensic evidence to convict. The Sixth Circuit notes that the "lack of physical evidence does not render the evidence presented insufficient; instead it goes to weight of the evidence, not its sufficiency." *Gipson v. Sheldon*, 659 F. App'x. 871, 882 (6th Cir. 2016).

There were multiple pieces of evidence to establish petitioner's identity as the perpetrator; the Michigan Court of Appeals did not unreasonably apply *Jackson v. Virginia* in rejecting petitioner's sufficiency of evidence claim. *See Moreland v. Bradshaw,* 699 F.3d 908, 919-21 (6th Cir. 2012).

**B. Claims # 2 and # 3.  The evidentiary error claims.**

Petitioner in his second and third claims alleges that the judge erred in allowing the prosecutor to introduce certain evidence.

Petitioner in his second claim alleges that the judge erred in permitting the prosecutor to introduce evidence that petitioner had done research into how to pass

a polygraph examination.  Petitioner claims this violates the general rule of evidence that polygraph examinations are inadmissible.

It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  A federal court is limited in federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id.*  Thus, errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court. *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000).

Petitioner is not entitled to habeas corpus relief on his claim involving the admission of evidence that he had researched how to take countermeasures to beat a polygraph examination.  The United States Supreme Court has never held that testimony or evidence which implies the results of a polygraph or similar test renders a criminal defendant's trial fundamentally unfair, in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Maldonado v. Wilson,* 416 F.3d 470, 477 (6th Cir. 2005).  To grant habeas corpus relief to petitioner "would necessarily imply that the Constitution requires all states to have rules of evidence precluding some testimony about truth tests." *Id.* at 478.  Because no Supreme Court precedent demands this result, the Michigan Court of Appeals' rejection of petitioner's claim was not unreasonable under 28 U.S.C. § 2254(d). *Id.*

14

Moreover, the Sixth Circuit Court of Appeals on direct review of federal criminal convictions has "refused to impose a *per se* prohibition against polygraph evidence, and the mere mention of the words 'polygraph examination' does not entitle a defendant to a new trial." *United States v. Odom*, 13 F.3d 949, 957 (6th Cir. 1994).

The Michigan Court of Appeals rejected petitioner's claim:

> The trial court made a distinction between the results of a polygraph examination and evidence that someone had inquired about beating a polygraph. With the latter, there was no danger that the jury would infer the results of a polygraph and it tended to show a consciousness of guilt. The trial court cautioned the prosecutor that any reference to taking a polygraph or the results of a polygraph would be inadmissible error that could require a mistrial. There was no reference to whether defendant was offered a polygraph, to the administration of a polygraph, to the results of a polygraph, or to statements made before, during, or after a polygraph. There was no evidence that a polygraph was involved in the investigation. Thus, there was no danger that the results of a scientifically unproven instrument would affect the jury's deliberations. The jury was not presented with evidence regarding a polygraph from which they could infer the credibility of any witnesses.

*People v. Duke*, 2017 WL 603558, at * 3.

The Michigan Court of Appeals' decision was reasonable, precluding habeas corpus relief.

In his second claim, and again in his third claim, petitioner argues that the judge erred in permitting the prosecutor to introduce irrelevant and prejudicial evidence both regarding petitioner's research into how to pass a polygraph and his prior threat to kill the victim.

15

Petitioner's claim that he was denied a fair trial by the admission of irrelevant and highly prejudicial evidence cannot form the basis for habeas corpus relief, because it involves a state law evidentiary issue. *See Hall v. Vasbinder*, 551 F. Supp. 2d 652, 676 (E.D. Mich. 2008), *rev'd on other grnds*, 563 F.3d 222 (6th Cir. 2009); *see also Oliphant v. Koehler*, 451 F. Supp. 1305, 1308 (W.D. Mich. 1978).

Petitioner's claim that this evidence should have been excluded under M.R.E. 403 for being more prejudicial than probative does not entitle petitioner to habeas corpus relief.  The Sixth Circuit observed that "[t]he Supreme Court has never held (except perhaps within the capital sentencing context) that a state trial court's admission of *relevant* evidence, no matter how prejudicial, amounted to a violation of due process." *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir. 2012) (emphasis original).  The Michigan Court of Appeals concluded that evidence that petitioner was looking to beat the polygraph examination by deceitful means was relevant as to his consciousness of guilt. *People v. Duke*, 2017 WL 603558, at * 4. The Michigan Court of Appeals further concluded that evidence that petitioner threatened to rob and kill the victim five years prior to the shooting was relevant to show petitioner's motive to kill the victim for his money, as well as showing that petitioner knew that the victim had a habit of having money in his home. *Id.* at * 4.

This Court must defer to these determinations.  Petitioner is not entitled to habeas corpus relief on his second and third claims.

### C. Claims # 4 and # 5. The ineffective assistance of counsel claims.

Petitioner in his fifth claim alleges that trial counsel was ineffective.  In his fourth claim, petitioner alleges that appellate counsel was ineffective for failing to raise the ineffective assistance of trial counsel claim on his appeal of right. [1]

A defendant must satisfy a two prong test to establish the denial of the effective assistance of counsel.  First, the defendant must show that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id*.  In other words, the defendant must overcome the presumption that, under the circumstances, the challenged action might be sound

---

[1] Respondent argues that the claims are procedurally defaulted because petitioner failed to show cause and prejudice, as required by M.C.R. 6.508(D)(3), for failing to raise them on his appeal of right.  Petitioner argues that his default should be excused because appellate counsel was ineffective for failing to raise his ineffective assistance of trial counsel claims on his appeal of right.  Given that the cause and prejudice inquiry for the procedural default issue merges with an analysis of the merits of the defaulted claims, it would be easier to consider the merits of the claims. *See Cameron v. Birkett,* 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004).

trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009). The *Strickland* standard applies as well to claims of ineffective assistance of appellate counsel. *See Whiting v. Burt,* 395 F.3d 602, 617 (6th Cir. 2005).

In his fifth claim, petitioner first alleges that trial counsel inadequately cross-examined the prosecution's firearm tool and identification mark expert witness, Sergeant Jeffrey Amley, particularly concerning his findings in regards to the plastic sabot evidence.

"Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub,* 194 F. Supp. 2d at 651. "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Id.*

18

Defense counsel extensively cross-examined Sergeant Amley at trial. Counsel obtained a number of concessions from Sergeant Amley during this cross-examination:

• Sergeant Amley admitted, "I can't tell you exactly where that shot was fired at," referring to the location where the projectile that killed the victim was fired from. (ECF No. 8-9, PageID.1462-63).

• Sergeant Amley admitted that he had no way to match item 3, the lead fired shotgun slug, to items 4 and 6, two plastic sabot portions, found at the crime scene; nor could he determine, based on his observations, what direction items 4 and 6 were fired. (*Id.*, PageID.1441, 1466-67).

• Regarding whether item L3, the lead fired shotgun slug, came from a Winchester brand shotgun shell, Winchester being the brand of ammunition petitioner was alleged to have purchased near the date of the murder, Sergeant Amley admitted, "I can't say exactly that it is Winchester brand ammunition;" nor could he testify that the plastic sabots were Winchester sabots. (*Id.*, PageID.1470).

• Sergeant Amley admitted that, based on the FBI database, both Mossberg and Pennsylvania Arms brand guns had the specific twist and number of lands and grooves corresponding to the plastic sabots collected by law enforcement in this case; petitioner was only known to possess a 12-gauge Mossberg brand shotgun. (*Id.,* PageID.1471-72).

• Sergeant Amley admitted that at the time of the preliminary examination hearing, he was unable to determine whether any of the plastic sabot portions fit together (whereas at trial, after reanalyzing the plastic sabot portions, he concluded that many of them fit together, that is, were fired as a single unit) (*Id.*, PageID.1457-59, 1473-74).

• Sergeant Amley corrected his trial testimony that two sabot portions located at the crime scene, items 119-B and 119-M, were two halves of the same whole sabot: he testified, "I actually said 119-I and 119-N were consistent with having been a single unit," and 119-B and 119-M did not match. (*Id.*, PageID. 1474-75).

• Sergeant Amley admitted that he could not say three of the plastic sabot portions collected by police at the crime scene, items 119-B, 119-C, and 119-M, were consistent with having been a single unit. (*Id.*, PageID.1475).

• Sergeant Amley admitted, regarding items 119-B, 119- C and 119-M, "They were consistent with that it was produced by a Mossberg rifled shotgun barrels, however I can't discount any other firearms that may have fired them." (*Id.*, PageID.1475).

• Sergeant Amley admitted that it was possible that two of the matching plastic sabot portions retrieved from the crime scene, items 119-N and 119-I, were fired by a Mossberg 12-gauge shotgun other than the actual murder weapon. (*Id.* PageID.1477-78). He admitted there may be another firearm out there with similar rifling dimensions that may have fired any of the plastic sabots collected by law enforcement. (*Id.*, PageID.1480-81). He further admitted that a lawnmower could shoot out a sabot laying on top of the grass if it was struck by a lawnmower blade. (*Id.*, PageID.1484-85).

• Sergeant Amley conceded that he did not know whether the plastic sabot portions were submitted for fingerprint analysis. (*Id.*, PageID.1486).

• Sergeant Amley admitted item L3, the lead slug recovered at the crime scene, was not similar to the unfired, undamaged Winchester ammunition petitioner was alleged to have purchased near the incident date. Sergeant Amley described that the unfired Winchester ammunition had a hollow point, whereas item L3, damaged slug, had a notch in the center; he also testified, "I can't eliminate that that may be the result of the damage to the slug." (*Id.*, PageID.1498-1501).

Defense counsel brought up the discrepancies and inconsistencies in Sergeant Amley's testimony during closing argument. Counsel stated, "Jeff Amley, their expert, the guy who was supposed to come in and wrap this up with a bow for you on the last day of trial and say those sabots came from a Mossberg 12-

20

gauge shotgun didn't say it. He couldn't say it." (ECF No. 8-10, PageID.1608).

Counsel mentioned the weaknesses in Sergeant Amley's testimony at length for the

jury as well. (*Id.*, PageID.1608-10). Counsel noted, "[T]hey can't match the slug

inside the house to the sabots outside the house." (*Id.*, PageID.1612). Counsel also

brought up that pictures showed that the victim had a box of Winchester shotgun

shells on the table in his basement. (*Id.*, PageID.1613). Counsel concluded:

> You don't know when the sabots were discarded there, placed there, dropped there, blown there. You don't know what direction they were fired in. You don't know what kind of gun fired them really. (*Id.*, PageID.1613).

In the present case, defense counsel's performance did not constitute

ineffective assistance of counsel where the record shows that defense counsel

carefully cross-examined Sergeant Amley and in his closing argument emphasized

the weaknesses in his testimony. *See Krist v. Foltz,* 804 F. 2d 944, 948-49 (6th

Cir. 1986); *Millender v. Adams,* 187 F. Supp. 2d 852, 872 (E.D. Mich. 2002).

"Although other attorneys might have reached a different conclusion about the

value of cross-examining [the witness] in greater detail, counsel's strategic choice

not to further cross-examine Sergeant Amley was "'within the wide range of

reasonable professional assistance.'" *See Moss v. Hofbauer,* 286 F.3d 851, 864 (6th

Cir. 2002) (quoting *Strickland*, 466 U.S. at 689). Finally, petitioner has failed to

identify how additional impeachment of Sergeant Amley would have affected the

jury's decision. Defense counsel did not perform ineffectively by not more

forcefully cross-examining the witness, particularly when the effect of further probing was entirely speculative on petitioner's part. *See Jackson v. Bradshaw,* 681 F.3d 753, 764-65 (6th Cir. 2012).

Petitioner further argues that counsel was ineffective for failing to adequately cross-examine other witnesses, but does not specify which witnesses should have been questioned in greater detail or what questions should have been asked.

Conclusory allegations of ineffective assistance of counsel, without any evidentiary support, do not provide a basis for habeas corpus relief. *See Workman v. Bell,* 178 F.3d 759, 771 (6th Cir. 1998). Defense counsel did not perform ineffectively in his cross-examination of the other witnesses, particularly when the effect of further probing was entirely speculative on petitioner's part. *See Jackson v. Bradshaw,* 681 F.3d at 764-65.

Petitioner next claims that trial counsel was ineffective for failing to call Jacob Russo to impeach Christopher Chambers' testimony. Chambers had testified that he cut all ties with petitioner in 2006 after petitioner told him that he intended to rob the victim and kill him if necessary. Russo in his affidavit claims that Chambers and petitioner were best friends and continued to have a relationship long after petitioner told Chambers that he intended to rob and kill the victim. Russo indicated that he had reviewed petitioner's pre-sentence report, which

22

mentioned an interview that Mr. Chambers gave to the Livingston County Sheriff's Department on April 29, 2012, in which Chambers told the police that every time that he and petitioner socialized, petitioner mentioned robbing the victim and again mentioned it several weeks before petitioner went to prison on a prior offense, which would have been in 2009, long after Chambers claimed to have cut ties with petitioner. Russo also brings up in his affidavit that Mr. Chambers had been convicted of several drug offenses. (ECF No. 16-6, PageID.2369-72).

A defense counsel has no obligation to present evidence or testimony that would not have exculpated the defendant. *See Millender v. Adams,* 376 F.3d 520, 527 (6th Cir. 2004) (internal quotation omitted).   A defense counsel also has no duty to present impeachment evidence that would be of marginal utility. *See United States v. Munoz*, 605 F.3d 359, 381-82 (6th Cir. 2010).  Russo's proposed testimony that Mr. Chambers had lied about cutting ties with petitioner in 2006 but had instead continued to associate with petitioner after this date would have been of marginal value in impeaching Mr. Chambers' credibility.  If anything, testimony that Chambers had continued to have a relationship with petitioner, during which time petitioner continued to express his desire to rob the victim, would have only bolstered the prosecution's case.

Moreover, Mr. Russo could not have testified about Mr. Chambers' prior drug convictions as they would have been inadmissible to impeach Mr. Chambers'

23

credibility. Pursuant to M.R.E. 609, evidence that a witness has been convicted of a crime may not be admitted unless the crime: (1) contained an element of dishonesty or false statement, or (2) contained an element of theft, was punishable by more than one year in prison, and has significant probative value on the issue of credibility.  Counsel is not ineffective for failing to present inadmissible evidence. *See, e.g., Fitchett v. Perry*, 644 F. App'x. 485, 490 (6th Cir. 2016).

Petitioner further claims that trial counsel was ineffective for failing to call certain alibi witnesses. (ECF No. 16, PageID.2279).

Petitioner is not entitled to relief on his claim because he failed to provide this Court an affidavit from these alleged alibi witnesses concerning their proposed testimony and willingness to testify on petitioner's behalf.  Conclusory allegations of ineffective assistance of counsel, without any evidentiary support, do not provide a basis for habeas relief. *See Workman v. Bell,* 178 F.3d at 771.  Petitioner offered no evidence beyond his own assertions as to whether these witnesses would have testified and what the content of their testimony would have been.  In the absence of such proof, petitioner is unable to establish that he was prejudiced by counsel's failure to call alibi witnesses to testify at trial, so as to support the second prong of an ineffective assistance of counsel claim. *See Clark v. Waller,* 490 F.3d 551, 557 (6th Cir. 2007).

Petitioner also claims that trial counsel should have called expert witnesses. A habeas petitioner's claim that trial counsel was ineffective for failing to call an expert witness cannot be based on speculation. *See Keith v. Mitchell,* 455 F.3d 662, 672 (6th Cir. 2006). Petitioner has offered no evidence that he had an expert witness who would testify and what the content of this witness' testimony would have been. In the absence of such proof, petitioner is unable to establish that he was prejudiced by counsel's failure to call an expert witness, so as to support the second prong of an ineffective assistance of counsel claim. *See Clark v. Waller,* 490 F.3d at 557.

Petitioner next claims that trial counsel was ineffective for failing to present evidence of his bank accounts and other financial documents (ECF No. 16-5), in order to refute the prosecution's theory that petitioner robbed and killed the victim because he was financially insolvent.

Assuming petitioner was not, in fact, financially insolvent at the time of the murder, such evidence would not have exculpated him of the crime, in light of the significant evidence of his guilt aside from petitioner's alleged financial motive. *See Smith v. Mullin*, 379 F.3d 919, 935 (10th Cir. 2004) (defendant was not prejudiced by trial counsel's failure to challenge state's evidence of motive during guilt phase of capital murder trial, as element of ineffective assistance claim, where successful challenge to state's theory that defendant killed his wife and step-

25

children for insurance money would have had no effect on verdict, given overwhelming evidence of guilt).  In particular, evidence that petitioner had adequate finances would have done nothing to undercut the evidence that petitioner boasted on his Facebook account that he suddenly had $ 30,000.00 to spend. Petitioner is not entitled to relief on his ineffective assistance of trial counsel claims.

Trial counsel was not ineffective.  "[A]ppellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'" *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).  Because trial counsel was not ineffective, appellate counsel was not ineffective in failing to raise this claim on petitioner's appeal of right. *See, e.g., Fautenberry v. Mitchell*, 515 F.3d 614, 642 (6th Cir. 2008).  Petitioner is not entitled to relief on his fourth and fifth claims.

### D. Claim # 6. The *Brady*/discovery claims.

Petitioner next contends that the prosecutor violated his rights to discovery and due process.

It is well-settled that there is no general constitutional right to discovery in a criminal case. *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) (denying due process claim of a defendant who was convicted with aid of surprise testimony from an accomplice who was an undercover agent); *United States v. Presser*, 844

F.2d 1275, 1281 (6th Cir.1988) (citing *Weatherford*).  A claim that a prosecutor

violated state discovery rules is not cognizable in federal habeas corpus review,

because it is not a constitutional violation. *See Lorraine v. Coyle,* 291 F.3d 416,

441 (6th Cir. 2002).   Petitioner would not be entitled to habeas corpus relief

simply because the prosecutor violated M.C.R. 6.201 or some other Michigan rules

regarding discovery.

It is true that suppression by the prosecution of evidence favorable to the

defendant upon request violates due process, where the evidence is material to

either guilt or punishment of the defendant, irrespective of the good or bad faith of

the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Evidence is material

only if there is a reasonable probability that, had the evidence been disclosed to the

defense, the result of the proceeding would have been different.  A "reasonable

probability is a probability sufficient to undermine confidence in the outcome."

*United States v. Bagley,* 473 U.S. 667, 683 (1985).  In *Strickler v. Greene,* 527

U.S. 263, 281-82 (1999), the Supreme Court articulated three components or

essential elements of a *Brady* claim: (1) the evidence at issue must be favorable to

the accused, either because it is exculpatory, or because it is impeaching; (2) the

evidence must have been suppressed by the State, either willfully or inadvertently;

and (3) prejudice must have ensued.  "Prejudice (or materiality) in the *Brady*

context is a difficult test to meet." *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002).

Petitioner claims that the prosecutor failed to turn over a statement that Mr. Chambers had with the police on either April 24, 2012 or April 29, 2012. Mr. Chambers told the police that when he and petitioner were young, petitioner had talked to Chambers about robbing the victim at gun point and killing him if necessary "a handful of times." Chambers told the police that petitioner mentioned this to him "every time they [Mr. Chambers and Defendant] would drink together." Mr. Chambers told the police these conversations occurred while he and petitioner worked for the victim, prior to petitioner being sentenced to prison. At that time, Mr. Chambers stated that he stopped socializing with petitioner. Petitioner claims that Mr. Chambers' statement to the police would impeach his trial testimony that Chambers cut off all ties to petitioner in 2006, since petitioner was sentenced to prison in 2009 not 2006.

As an initial matter, there is some dispute over whether the prosecutor provided defense counsel with this supplemental report prior to trial. Assuming that the report was not provided to counsel prior to trial, petitioner is nonetheless not entitled to relief on his claim. The minor discrepancies over the date in which Mr. Chambers severed all ties with petitioner was not material. Evidence that impeaches a witness "may not be material if the State's other evidence is strong

28

enough to sustain confidence in the verdict." *Smith v. Cain*, 565 U.S. 73, 76 (2012)

(citing *United States v. Agurs*, 427 U.S. 97, 112-113, and n. 21 (1976)).

Impeachment evidence may be considered to be material where the witness in

question supplies the only evidence linking the defendant to the crime or the only

evidence of an essential element of the offense. *See United States v. Avellino*, 136

F.3d 249, 256 (2nd Cir. 1998); *Lyon v. Senkowski*, 109 F. Supp. 2d 125, 139

(W.D.N.Y. 2000).  The Sixth Circuit Court of Appeals has noted that:

"[C]onsiderable authority from the Supreme Court and our court indicates that a

defendant suffers prejudice from the withholding of favorable impeachment

evidence when the prosecution's case hinges on the testimony of one witness."

*Harris v. Lafler*, 553 F.3d 1028, 1034 (6th Cir. 2009) (internal citations omitted).

Mr. Chambers was not the only witness against petitioner.  Considerable

additional evidence of petitioner's guilt was presented to the jury.  Accordingly,

any evidence that would have impeached Mr. Chambers about the date that he

severed ties with petitioner was not material evidence for purposes of *Brady.*

Moreover, the prosecutor's alleged failure to provide petitioner with Mr.

Chambers' 2012 interview with the police did not prejudice petitioner under *Brady*

because it was cumulative of the other evidence that had been introduced at trial to

impeach Mr. Chambers' credibility. *See Brooks v. Tennessee*, 626 F.3d 878, 892-

94 (6th Cir. 2010).   Mr. Chambers admitted he could not remember the month,

29

day, or season when petitioner made the comment about wanting to rob and kill the

victim.  Although Mr. Chambers initially stated that petitioner made this comment

to him on a day after they worked together for the victim, he also stated that after

he and petitioner dropped out of high school, they went to work for different

employers.  Mr. Chambers testified he had been living with petitioner and his

father but moved out of the house about a week after petitioner made the statement

to him. However, Mr. Chambers could not remember the week, month, or season

that he moved out of the house. (ECF No. 8-9, PageID.1264-67).  Although Mr.

Chambers testified that the victim paid them in cash, he could remember no details

about how the victim would pay them. (*Id.* PageID.1268-69).  Chambers later

recounted that petitioner mentioned robbing the victim and made a statement to the

effect that no one would know about the robbery and that "we could take care of it

if we need to" which implied that petitioner would shoot the victim. (*Id.*

PageID.1271-72).  Chambers later tried to correct his testimony to claim that

petitioner had said that he would shoot the victim if he needed to (*Id.*

PageID.1273), but counsel confronted Chambers with the inconsistencies in his

account of what petitioner had said precisely concerning his intent to shoot or kill

the victim. (*Id.* PageID.1273-74).  In light of the fact that Mr. Chambers was

impeached on a number of matters, evidence that he may not have broken off his

relationship with petitioner in 2006 was merely cumulative.

Petitioner also claims that he was deprived of a due process and a fair trial because law enforcement "apparently switched" the plastic sabot portions and halves law enforcement collected at the crime scene and at petitioner's home, which Sergeant Amley analyzed and reanalyzed in this case. (ECF No. 16, PageID.2289-2291.)

Petitioner is not entitled to habeas corpus relief on his claim that the police planted evidence in this case because his claim is uncorroborated by any evidence. *Compare Moore v. Gibson*, 195 F.3d 1152, 1166 (10th Cir. 1999) (habeas petitioner was entitled to discovery on *Brady* claim that police officers planted hair and fiber evidence in his home and vehicle and failed to disclose this fact when allegations, if proved, would warrant habeas relief and when allegations were supported by statement of mortician, which in turn was partially corroborated by, and consistent with, the trial record). Petitioner is not entitled to relief on his claim.

**Claim # 7. The cumulative evidence claim.**

Petitioner lastly contends that he is entitled to habeas corpus relief because of cumulative error.

The cumulative weight of alleged constitutional trial errors in a state prosecution does not warrant federal habeas relief, because there is no clearly established federal law permitting or requiring the cumulation of distinct

31

constitutional claims to grant habeas corpus relief. *Moore v. Parker,* 425 F.3d 250, 256 (6th Cir. 2005).  Petitioner is not entitled to habeas relief based on cumulative error. *Id.*

The Court denies the petition for writ of habeas corpus.   The Court will deny petitioner a certificate of appealability.  In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because reasonable jurists would not find this Court's assessment of petitioner's claims to be debatable or wrong. *Johnson v. Smith,* 219 F. Supp. 2d 871, 885 (E.D. Mich. 2002).

**IV.  CONCLUSION**

Accordingly, the Court **DENIES WITH PREJUDICE** the petition for a writ

of habeas corpus.  The Court further **DENIES** a certificate of appealability.

**SO ORDERED.**

        s/Paul D. Borman
        PAUL D. BORMAN
        UNITED STATES DISTRICT JUDGE

DATED: August 7, 2023